**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

………………………………………..

| | |
|---|---|
| A.J., a minor child by and through ) | |
| his mother, Donnell Creppel; G.M., a ) | |
| minor child by and through his mother, ) | |
| Jessica Michot; B.W., a minor child by ) | |
| and through his mother, Kodi Wilson; ) | |
| B.C., a minor child by and through his ) | |
| mother, Sarah Washington, ) | CIVIL ACTION NO. _____ |
| ) | |
| *Plaintiffs* ) | JUDGE _____ |
| ) | |
| v. ) | MAGISTRATE JUDGE _____ |
| ) | |
| ) | CLASS ACTION |
| REBEKAH GEE, in her official ) | |
| capacity as Secretary of ) | |
| Louisiana Department of Health, and ) | |
| the LOUISIANA DEPARTMENT ) | |
| OF HEALTH ) | |
| ) | |
| *Defendants*. ) | |

……………………………………… )

## COMPLAINT

## I.    INTRODUCTION

1.    This case seeks declaratory and injunctive relief to compel the Louisiana Department of Health and its director, Rebekah Gee, to arrange for the in-home skilled nursing care that they have authorized for medically fragile, Medicaid-enrolled children.

2.    Plaintiffs A.J., G.M., B.W., and B.C., and class members are children under the age of 21 who are enrolled in Medicaid, a state and federally funded health insurance program for individuals with limited income and resources. The children are dependent on medical technologies for survival.  They rely on ventilators, tracheostomy tubes, and/or gastrostomy tubes to breathe and receive nutrition. They require assistance with

activities like toileting, dressing, eating, and moving. Because of their medical and survival needs, the Defendants have authorized the children to receive in-home skilled nursing services so that they may live safely in their homes and with their families in the community.

3. The Medicaid Act requires Defendants to "arrang[e] for (directly or through referral to appropriate agencies, organizations, or individuals)" treatment that is covered by the Early and Periodic Screening, Diagnostic and Treatment (EPSDT) provisions of the Medicaid Act and that the individual plaintiffs and class members need to "correct or ameliorate" their conditions. EPSDT covered services include in-home shift nursing, or "private duty" nursing, as a covered benefit for Medicaid beneficiaries under the age of 21. 42 U.S.C. § 1396a(a)(43)(C); 42 U.S.C. § 1396d(r); 42 U.S.C. § 1396d(a)(8). The Medicaid Act also requires the Defendants to ensure that necessary in-home shift nursing services are provided with reasonable promptness. 42 U.S.C. § 1396a(a)(8).

4. Due to systemic deficiencies in their policies, practices, and procedures, Defendants are failing to arrange for the in-home skilled nursing services they have found the children to need and are failing to provide those services in a timely manner.

5. Defendants' deficient policies, practices, and procedures related to arrangement of in-home skilled nursing services also violate the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (Section 504). 42 U.S.C. § 12132; 29 U.S.C. § 794(a). These violations have left Plaintiffs and Class members without medically necessary services, placing Plaintiffs at a serious risk of hospitalization and institutionalization.

6. This class action lawsuit asks the Court to order Defendants to take all steps

necessary to arrange for authorized, medically necessary in-home shift nursing services for Plaintiffs and Class members.

## II.   JURISDICTION AND VENUE

7.     This is an action for declaratory and injunctive relief to enforce Plaintiffs' rights under the EPSDT and reasonable promptness mandates of Title XIX of the Social Security Act (Medicaid Act); the ADA, 42 U.S.C. §12132; and Section 504, 29 U.S.C. § 794(a).

8.     Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343.

9.     At all times relevant to this action, Defendants have acted under color of law.

10.     This Court is authorized to award Plaintiffs' requested declaratory relief and preliminary and permanent injunctive relief under 28 U.S.C. §§ 2201-2202, 42 U.S.C. § 1983, and Fed. R. Civ. P. 65.

11.     Venue is proper in the Middle District of Louisiana pursuant to 28 U.S.C. § 1391(b) because the Defendants operate and perform their official duties therein and thus reside therein for purposes of venue, and because a substantial part of the events and omissions giving rise to the claims herein occur in parishes that are part of the Middle District of Louisiana.

## III.   THE PARTIES

12.     Plaintiff A.J. is nine years old and is a Medicaid beneficiary.  As a result of his medical conditions, Defendants have determined that A.J. needs 84 hours per week of extended home health (EHH) skilled nursing at home.  A.J. receives approximately 32 hours per week of in-home nursing services.  He participates in the State's Children's Choice Medicaid waiver program. He resides at home with his mother in Lacombe,

Louisiana. Pursuant to Fed. R. Civ. P. 17(c), A.J. brings this action through his mother.

13.    Plaintiff G.M. is seven years old and is a Medicaid beneficiary.  As a result of his medical conditions, Defendants have determined that G.M. needs 84 hours per week of EHH skilled nursing at home.  G.M. regularly receives about 48 hours per week of in-home shift nursing services.  G.M. participates in the State's Residential Options Waiver (ROW) program under Medicaid. He resides at home with his parents and his sister in Denham Springs, Louisiana.  Pursuant to Fed. R. Civ. P. 17(c), G.M. brings this action through his mother.

14.    Plaintiff B.W. is thirteen years old and is a Medicaid beneficiary. As a result of his medical conditions, Defendants have determined that B.W. needs 118 hours per week of EHH skilled nursing at home. The amount of EHH hours B.W. receives fluctuates from week to week but it almost never covers the entire 118 hours necessary. He participates in the New Opportunities Waiver through the State's Medicaid program. B.W. resides at home with his parents and sister in Baton Rouge, Louisiana. Pursuant to Fed. R. Civ. P. 17(c), B.W. brings this action through his mother.

15.    Plaintiff B.C. is fifteen years old and is a Medicaid beneficiary. B.C. participates in the New Opportunities Waiver through the State's Medicaid program. After living in an intermediate care facility for seven years, B.C. returned home in 2014 with about 70 hours of EHH skilled nursing authorized by Defendants. In early 2017, Defendants determined that B.C.'s nursing needs could be met with a daily nursing visit of three hours or less. Since that time, B.C. has been without any in-home nursing services. B.C. resides at home with his mother and two siblings in Amite City, Louisiana. Pursuant to Fed. R. Civ. P. 17(c), B.C. brings this action through his mother.

16.     Each individual Plaintiff is a "qualified person with a disability" within the meaning of the ADA, 42 U.S.C. § 12131(2), and the Rehabilitation Act, 29 U.S.C. § 705(20)(B).

17.     Defendant Rebekah Gee is the Secretary of the Louisiana Department of Health (LDH). Secretary Gee is responsible for directing, organizing, and administering LDH's medical programs and contractual arrangements.  L.S.A.-R.S. 36:253. Her responsibilities in this role include ensuring LDH's compliance with federal and state laws. Secretary Gee is sued in her official capacity.

18.     Defendant Louisiana Department of Health is the single state agency responsible for administering Louisiana's Medicaid program.

## IV.   CLASS ACTION ALLEGATIONS

19.     Plaintiffs bring this action as a statewide class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) on behalf of:

> All Medicaid beneficiaries under the age of 21 in Louisiana enrolled in the Children's Choice Waiver, the New Opportunities Waiver, the Supports Waiver, or the Residential Options Waiver who have been authorized for in-home nursing services by the Defendants, but are not receiving the nursing services at the level authorized by the Defendants.

20.     The class does not include Medicaid beneficiaries on the Request for Services Registry, a listing of all persons that have requested developmental disability waiver services, under the age of 21, but who are currently not enrolled in the Children's Choice Waiver, the New Opportunities Waiver, the Supports Waiver, or the Residential Options Waiver. These individuals are already class-members in the lawsuit *Chisholm v. Gee*, CV-97-3274 (E.D. La.)(*Chisholm*), under which they may seek remediation for the violations alleged herein.

5

21.     The Class is so numerous that joinder of all persons is impracticable. Upon information and belief, there are over 300 class members under the age of 21 who are approved to receive more than three hours of in-home shift nursing services weekly through the Medicaid program. Within this group, only about 41-57% of the in-home shift nursing services the children are authorized to receive are actually provided, leaving a service gap of 43-59%. There are additional class members who are authorized to receive less than three hours of nursing per day based on a doctor's order.

22.     Plaintiffs and Class members have severe disabilities and limited financial resources. They are unlikely to institute individual actions.

23.     The claims of Plaintiffs and Class members raise common questions of law and fact. The factual questions common to the entire Class include whether Defendants' system-wide policies, practices, and procedures have resulted in Medicaid beneficiaries under the age of 21 being unable to obtain the Medicaid-covered, medically necessary in-home shift nursing services they have been approved to receive.

24.     The legal questions common to Plaintiffs and all Class members include:

a.     Whether Defendants have failed to "arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment [in-home shift nursing services]" to Plaintiffs and Class members as mandated by the EPSDT provisions of the Medicaid Act pursuant to 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B), 1396a(a)(43)(C) and 1396d(r)(5);

b.     Whether Defendants have failed to furnish medical assistance with reasonable promptness to Plaintiffs and Class members pursuant to 42 U.S.C. § 1396a(a)(8);

c.   Whether Defendants have violated the ADA and/or the Rehabilitation Act by failing to arrange for Medicaid-covered, medically necessary in-home shift nursing services, thereby placing them at risk of unnecessary institutionalization;

d.   Whether Defendants have violated the ADA and/or the Rehabilitation Act by failing to ensure that in-home shift nursing services are administered to Plaintiffs and Class members in the most integrated setting appropriate to their needs;

e.   Whether Defendants have violated the ADA and/or the Rehabilitation Act by failing to make reasonable modifications to their programs and policies that would result in the availability of in-home shift nursing services; and

f.   Whether Defendants have violated the ADA and/or the Rehabilitation Act by using criteria or methods of administration that have the effect of subjecting Plaintiffs and Class members to discrimination on the basis of disability, or defeating or substantially impairing accomplishment of the objectives of Defendants' program.

25.   Plaintiffs' claims are typical of the Class members' claims.  None of the Plaintiffs or Class members are receiving in-home shift nursing services at the level that Defendants agree is medically necessary to correct or ameliorate their conditions.

26.   Plaintiffs are adequate representatives of the Class because they suffer from the same deprivations as the other Class members and have been denied the same federal rights that they seek to enforce on behalf of the other Class members.

27.     Plaintiffs will fairly and adequately represent the absent Class members' interests in obtaining injunctive relief for the violations of their rights and privileges. The Plaintiffs' interests are consistent with and not antagonistic to those of any person within the Class.

28.     Plaintiffs' counsel are qualified, experienced, and able to conduct the proposed litigation.

29.     Prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for the party opposing the Class, could be dispositive of the interests of the other Class members, or could substantially impair or impede their ability to protect their interests.

30.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy in that:

     a.  Multiplicity of suits with consequent burden on the courts and Defendants should be avoided; and

     b.  It would be virtually impossible for all Class members to intervene as parties-plaintiffs in this action.

31.     Defendants have acted or refused to act, and continue to act or refuse to act, on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief with respect to the Class as a whole.

## V.     IN-HOME SHIFT NURSING STATUTORY AND REGULATORY FRAMEWORK

### A.     The Medicaid Act and EPSDT

32.     The Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-

1396w-5, establishes a medical assistance program cooperatively funded by federal and state governments. The purpose of the Medicaid program is to enable states to furnish, as far as practicable, "(1) medical assistance on behalf of . . . aged, blind or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services," and "to help such families and individuals to attain or retain capability for independence or self-care. . . ." 42 U.S.C. § 1396-1.

33.    Participation by states in this program is voluntary; however, once a state elects to participate, it must comply with all requirements of the federal Medicaid Act and its implementing regulations and mandatory guidelines.

34.    Louisiana has elected to participate in, and receive federal matching funding through, the Medicaid program currently set at 65%. Federal Matching Shares for Medicaid and CHIP for Oct. 1, 2018 through Sept. 30, 2019, 82 Fed. Reg. 55383, 55385 (Nov. 21, 2017).

35.    States participating in the Medicaid program must designate a single state agency to administer or supervise the administration of the Medicaid program and ensure the program complies with all relevant laws and regulations. *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10.

36.    LDH is the single state agency that administers Medicaid. L.S.A.-R.S. 36:251. The duties of the single state agency are non-delegable. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10.

37.    The Medicaid program does not itself provide health care services to beneficiaries, nor does it provide those beneficiaries with money to purchase health care services directly. Rather, Medicaid is a vendor payment program that reimburses

participating providers—including in-home shift nursing providers—for the services they provide to Medicaid recipients.

38.    Each state's Medicaid program must make medical assistance available "with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). "The term 'medical assistance' means payment of part or all of the cost of the . . . care and services or the care and services themselves, or both." 42 U.S.C. § 1396d(a).

39.    States must assure that Medicaid services will be provided consistent with the best interests of recipients. *See* 42 U.S.C. § 1396a(a)(19).

40.    Federal law requires states participating in Medicaid to operate their Medicaid program pursuant to a state Medicaid plan that has been approved by the Secretary of the U.S. Department of Health and Human Services.

41.    States must cover certain mandatory services in their state Medicaid plans. 42 U.S.C. §1396a(a)(10)(A), 1396d(a)(1)-(5), (17), (21), and (28)-(29).  One mandatory service is EPSDT for children under age 21. 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r).

42.    EPSDT requires that the services that are coverable under 42 U.S.C. § 1396d(a) must be provided if they are "necessary health care, diagnostic services, treatment and other measures . . . to correct or ameliorate defects and physical and mental illnesses and conditions . . . regardless of whether or not such services are covered" for adults. 42 U.S.C. § 1396d(r)(5).  Services must be covered if they correct, compensate for, improve a condition, or prevent a condition from worsening, even if the condition cannot be prevented or cured.  U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs. (CMS), *EPSDT: A Guide for States: Coverage in the Medicaid*

*Benefit for Children and Adolescents* at 10 (June 2014),

https://www.medicaid.gov/medicaid/benefits/downloads/epsdt_coverage_guide.pdf.

43.    Private duty nursing, also called in-home shift nursing, is a service category

listed under Section 1396d(a); accordingly, the EPSDT benefit includes in-home shift

nursing necessary to ameliorate, correct, or maintain a child's condition.  42 U.S.C. §

1396d(a)(8).

44.    Private duty nursing is defined as "nursing services for beneficiaries who

require more individual and continuous care than is available from a visiting nurse or

routinely provided by the nursing staff of the hospital or skilled nursing facility. . . ."  42

C.F.R. § 440.80.

45.    Private duty nursing must be provided by a registered nurse (RN) or a

licensed practical nurse (LPN).  *See* 42 C.F.R. § 440.80(a). RNs and LPNs are licensed to

provide skilled nursing care in many settings including homes and hospitals. 42 C.F.R. §

409.31(a).

46.    Case management services, including targeted case management, are also

covered under the Medicaid Act and must be comprehensive and ensure the coordination

of medically necessary health care and social services. 42 U.S.C. §§ 1396d(a)(19),

1396n(c)(2)(A); 42 C.F.R. § 440.169(d)(1)-(4).

47.    Federal Medicaid regulations define case management, *inter alia*, as the

development of a specific plan of care, referral to services, scheduling appointments, and

monitoring and follow-up.  42 C.F.R. § 440.169(d)(1)-(4).  Monitoring and follow-up

activities are meant to ensure that the plan of care is implemented and services are being

furnished in accordance with the care plan.  *Id.* at § 440.169(d)(4).

48.     The EPSDT mandate requires Defendants to "provide for . . . arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services." 42 U.S.C. § 1396a(a)(43)(C).

49.     Defendants "must set standards for the timely provision of EPSDT services which meet reasonable standards of medical and dental practice . . . and must employ processes to ensure timely initiation of treatment, if required, generally within an outer limit of 6 months after the request for screening services." 42 C.F.R. § 441.56(e).

50.     Defendants are obligated to "design and employ methods to assure that children receive . . . treatment for all conditions identified as a result of examination or diagnosis." CMS, *State Medicaid Manual* § 5310.

51.     Defendants must "make available a variety of individual and group providers qualified and willing to provide EPSDT services." 42 C.F.R. § 441.61(b).

52.     The Medicaid Act also allows states to provide an expanded array of Medicaid services through Section 1915(c) home and community-based waiver programs. Medicaid beneficiaries qualify for these waiver programs when their level of care needs would otherwise make them eligible for placement in an institution, including nursing homes and hospitals. 42 U.S.C. § 1396n(c)(1). Thus, waiver enrollees have high medical needs and serious disabilities. These programs are called waivers because they allow states to ignore certain Medicaid requirements that would otherwise apply, such as requirements for comparable eligibility requirements and scope of benefits among beneficiaries. *Id.* § 1396n(c)(3).

53. Section 1915(c) waivers typically offer services in an amount, duration and scope that are not available through the state's Medicaid plan. States may also use these waivers to cover services that are not typically treated as medical assistance, such a home modification and respite services. *Id.* § 1396n(c)(4)(B).

54. Medicaid beneficiaries who are enrolled in a Section 1915(c) waiver continue to be eligible for state Medicaid plan services, such as EPSDT. Services through a Section 1915(c) waiver complement state plan services, including services under the EPSDT mandate.

### B. Anti-Discrimination Laws

55. Qualified individuals with disabilities are protected from disability discrimination, including segregation in institutions, by the ADA and Section 504.

56. In enacting the ADA, Congress found that, "[i]ndividuals with disabilities continually encounter various forms of discrimination, including . . . segregation. . . ." 42 U.S.C. § 12101(a)(5). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

57. Section 504 imposes the same prohibition on programs or activities that receive federal funds. Section 504, 29 U.S.C. §§ 794-794a.

58. Regulations implementing Title II of the ADA provide that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also* Section 504, 29 U.S.C. §§ 794-794a; 28 C.F.R. § 41.51(d). The most

integrated setting appropriate to the needs of a qualified individual with a disability means "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B.

59. The United States Supreme Court in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), held that the unnecessary institutionalization of individuals with disabilities is a form of discrimination under Title II of the ADA. The Court interpreted the ADA's "integration mandate" as requiring persons with disabilities to be served in the community when: (1) the state determines that community-based treatment is appropriate; (2) the individual does not oppose community placement; and (3) community placement can be reasonably accommodated. *Id.* at 607.

60. Regulations implementing Title II of the ADA and Section 504 provide: "A public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities. . . ." 28 C.F.R. § 35.130(b)(3); *see also* 28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).

61. ADA regulations further provide: "A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8); *see also* 45 C.F.R. § 84.4(b)(1)(iv).

62. As set forth in federal regulations: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

## VI.   FACTUAL ALLEGATIONS

### A.   LDH's Methods of Administering In-Home Nursing for Children

63. The Louisiana Medicaid program provides health coverage to beneficiaries either on a fee-for-service basis, known as legacy Medicaid, or through Healthy Louisiana, a centralized hub for coverage offered through Medicaid Managed Care Organizations (MCOs).

64. Under legacy Medicaid, the beneficiary seeks care from any provider who is participating in the Medicaid program, willing to treat the particular beneficiary, and willing to accept reimbursement at the amount set by LDH for the medical services provided. For beneficiaries enrolled in Healthy Louisiana, LDH contracts with health plans to provide health care to Medicaid beneficiaries within a prepaid, per member per month managed care system. La. Admin. Code, tit. 50, Pt I,  3101, et seq.

#### 1.   *In-Home Nursing Services*

65. Whether through legacy Medicaid or Healthy Louisiana, Defendants authorize Medicaid EHH nursing services only after a finding, with the support of a treating medical professional, that the services are medically necessary. The treating medical professional reviews and concurs or appropriately modifies a home health agency's proposed plan of care. Requests for EHH nursing services cannot be approved

without the signature of a Plaintiff or Class member's treating medical professional.

66.    Once approved, EHH nursing services may be provided by a home health agency enrolled with Medicaid and licensed by the State of Louisiana to provide EHH nursing services.

67.    Children requesting EHH may be denied EHH because, although they are determined to need in-home nursing, their needs do not meet the EHH threshold of more than three hours of nursing per day. When such children are denied EHH, the denial notice they receive often references the availability of in-home nursing services for less than three hours a day as a nursing service to meet their needs.

68.    In-home nursing services of less than three hours a day do not require prior authorization and are not considered by Defendants to be extended home health nursing under either legacy Medicaid or Healthy Louisiana.  A prescribing physician deems such services medically necessary through a doctor's order, which authorizes a qualified nursing provider to provide the in-home nursing services.

69.    A home health agency is a private organization that recruits, hires, and trains health professionals to provide services such as EHH; arranges scheduling of nurses; and ensures that staff is in compliance with licensing and certification requirements.  Home health agencies also develop plans of care for review and approval by patients' physicians and provide services in accordance with approved plans of care.

70.    A home health agency cannot be reimbursed for providing EHH nursing services without first receiving prior authorization from Defendants or their contractors to do so.

71.    Defendants have clustered the State's parishes into nine administrative

regions. Louisiana Department of Health: *Administrative Regions Map*,

http://ldh.la.gov/assets/docs/OrgCharts/RegionMap.jpg. Home health provider agencies

may not provide services outside of their designated region without permission from

Defendants.

2. *Home and Community-based Waiver Services*

72.     Louisiana provides home and community-based services to children with

developmental disabilities under age 21 through several Section 1915(c) waivers.

73.     Children enrolled in a Section 1915(c) waiver remain eligible for state

Medicaid plan services, including EPSDT.

74.     The New Opportunities Waiver (NOW) is the State's most comprehensive

waiver for home and community-based services for individuals with developmental

disabilities ages three and older. La. Admin Code. tit. 50, Pt XXI, §§ 13701-13937.

Services include community integration and development, environmental accessibility

adaptations, specialized medical equipment and supplies, center-based respite, and

supported employment. In-home nursing is available under this waiver, but as with other

EPSDT, NOW waiver participants under age 21 receive their in-home nursing services

through EPSDT instead of through the waiver.

75.     The Residential Options Waiver (ROW) is a Section 1915(c) waiver that

provides home and community-based services to individuals with developmental

disabilities of all ages. La. Admin Code. tit. 50, Pt XXI, §§ 16101-16343. Services

include day habilitation, supported employment, assistive technology, community living

supports, on-time transitional services, and personal emergency response systems. As

with the NOW, the ROW also provides in-home nursing as part of the waiver, but those

under 21 receive all possible services under EPSDT, including in-home nursing, before receiving services through the waiver.

76. The Children's Choice Waiver (CCW) is a Section 1915(c) waiver directed towards providing supplemental resources for children with developmental disabilities ages 0-18. La. Admin Code. tit. 50, Pt XXI, §§ 11101-11905. Services include center-based respite, aquatic therapy, art therapy, environmental accessibility adaptations, music therapy, sensory integration, and family support services. In-home nursing services are not provided under this waiver, but EPSDT provides in-home nursing for waiver participants under age 21.

77. The Supports Waiver is a 1915(c) waiver for individuals 18 years old and over, directed at providing pre-vocational and vocational services for individuals with developmental disabilities. La. Admin Code. tit. 50, Pt XXI, §§ 5501-5719. Services include day habilitation, housing stabilization, housing stabilization transition, personal emergency response systems, and respite. In-home nursing is not available through this program, but waiver participants under 21 who require in-home nursing would the service under EPSDT.

### 3. Case Management and Care Coordination Services

78. For all Louisiana Medicaid recipients participating in one of the State's Section 1915(c) Waivers, Defendants are responsible for providing case management. For these waivers, LDH uses a 'broker' model for case management in which it contracts with private agencies to provide support coordination services. The duties of case management for waiver recipients include ensuring that all necessary waiver and non-waiver services are provided in accordance with an approved, comprehensive plan of care

and monitoring delivery of all services identified within the comprehensive plan of care. *See, e.g.,* La. Admin. Code, tit. 50, Pt XXI, § 5715. One support coordinator, the Ventilator Assisted Care Program, specializes in providing support to children who need mechanical respiratory support at home.

79. The case management provided to Section 1915(c) waiver participants is generally part of targeted case management services. Medicaid beneficiaries may receive targeted case management services if determined medically necessary. Medicaid recipients under the age of 21 qualify for targeted case management if they are enrolled in one of the State's Section 1915(c) waivers for developmental disabilities, if they are in the *Chisholm* class, or if they meet the definition of a person with special needs. A person with special needs includes children with developmental delays, those who receive special education services, and those who have multiple health or family issues that impact the child's ongoing care. La. Admin. Code, tit. 50, Pt XV, § 11303.

80. When in-home nursing is found to be medically necessary for an individual, it is the support coordinator's responsibility to assist the individual in the creation of the plan of care. Defendant LDH must approve a Class member's plan of care. After a plan of care has been established, support coordinators are to assist class- members in finding a home health provider agency willing and able to meet the approved plan of care.

81. Beneficiaries enrolled in managed care also receive care coordination, which is a general function of managed care to ensure each individual has an ongoing source of care appropriate to their needs. 42 C.F.R. § 438.208(b). Care coordination services through the MCOs are meant to coordinate the services the MCO provides between settings of care and with services provided outside the MCO, such as from community

and social support providers. Care coordination services incorporate and identify appropriate methods of assessment and referral.

**B.      LDH's Failure to Arrange for In-Home Shift Nursing**

82.      Although Defendants have authorized in-home shift nursing services for Plaintiffs and Class members, Defendants have failed to arrange for these services with reasonable promptness by failing to establish and implement meaningful and effective policies, practices, and procedures to administer this benefit.

83.      Children authorized for EHH in Louisiana are only receiving about half the services for which they are authorized. Data from Defendants, provided in April 2019, shows that children ages 3-21 received about 41-48% of the in-home nursing hours for which they were authorized in 2018, while children aged 0-3 received about 47-57% of their authorized hours. As reflected by the records, the over 300 children with nursing needs are experiencing an in-home nursing services gap of 43-59%.

84.      When parents inform support coordinators that a child is not receiving authorized in-home shift nursing hours, the support coordinators commonly provide Class members with referral lists for the parents to use to find different or additional nursing providers. Referral lists are simply lists of qualified providers as of a certain point in time and do not indicate whether the agency can or will provide the specific services or hours the child needs. Sometimes support coordinators will assist recipients by making phone calls on their behalf. Regardless of these efforts, Class members frequently do not receive nursing care at their approved level of need. The parents are provided no further information as to how they may address the lack of in-home nursing hours or request action from the Defendants to provide or arrange for the necessary

nursing services.

85.     Home health agencies regularly request that family members assist in recruiting nurses. Often, even when found, recruited nurses are unwilling to participate in Medicaid through a home health agency.

86.     Unlike other services offered through Louisiana Medicaid, such as personal care services for waiver recipients, Class members are unable to self-direct their in-home nursing services. This means that even if Class members are able to find nurses independently, Defendants require that they be employed by a licensed home health agency prior to issuing reimbursement for services.

87.     Upon information and belief, Defendants do not train support coordinators on what steps are to be undertaken when there are no home health provider agencies able to meet the individual's plan of care.

88.     Defendants do not empower support coordinators to authorize overtime payment or higher wages when there is no provider agency available to provide in-home skilled nursing that a Class member needs.

89.     Defendants have billing codes, known as modifiers, for use in connection with EHH. These modifiers allow for home health agencies to receive higher rates for targeted areas of need or conditions. There are currently modifiers available for situations in which one nurse is caring for two EHH recipients simultaneously, for children with higher needs, for overnight shifts, for weekend shift, for holiday shifts, and for EHH services in rural areas.

90.     Defendants do not have a modifier for overtime hours. As such, the 'time and a half rate' for any overtime hours is billed to Defendants at the standard reimbursement

rate. Upon information and belief, most home health provider agencies are unwilling to authorize in-home nurses to work over 40 hours per week because they will lose money by doing so.

91.    The current modifiers have existed since at least 2012. However, with the exception of the modifier related to caring for two children at once, these modifiers are not printed in the fee schedule Defendants make available to home health agencies. To bill under these modifiers, home health agencies must receive permission from Defendants in advance.

92.    Defendants have actual or constructive knowledge of the number of weekly hours of in-home shift nursing services they have found to be medically necessary for each Plaintiff and putative Class member.

93.    Defendants have knowledge of the monthly billing for each Plaintiff's and Class member's EHH nursing services.  Therefore, Defendants are or should be aware of their failure to arrange medically necessary in-home shift nursing services when Defendants are not billed for the full amount of in-home shift nursing services.

94.    As waiver participants, Plaintiffs and Class members have person-centered planning processes to develop plans of care that outline their need for waiver and non-waiver services. Therefore, Defendants have knowledge of the non-EHH nursing services needs for Class members.

95.    As a result of the *Chisholm* suit, Defendants monitor the gap between authorized and rendered services for members of the *Chisholm* class. All *Chisholm* Class members who are prior authorized for in-home nursing services receive monthly telephone calls from Defendants to determine how many hours are actually being

received. This monitoring is not performed for putative Class members.

96.    Defendants fail at a systemic level to identify and authorize children who are in need of in-home nursing services but are not receiving those services.

97.    Defendants fail at a systemic level to effectively track and monitor children who are institutionalized because a lack of available nursing in the community or who have a shortfall between authorized and staffed nursing hours.

**C.    Plaintiff A.J.**

98.    Plaintiff A.J. is a nine-year-old brain cancer survivor. As a result of the brain surgery and related surgeries and treatment, A.J. has severe physical and developmental disabilities.

99.    A.J. requires skilled assistance 24 hours a day, seven days a week because of his medical needs. He is dependent on medical equipment to stay alive. This includes a tracheostomy, gastronomy tube, ventilator, oxygen concentrator, oxygen tanks, portable and stationary suction machine, feeding pump, pulse oximeter, and wheelchair.

100.    Plaintiff A.J. is a qualified individual with a disability under the ADA and Rehabilitation Act. The Defendants have regarded A.J. as having a disability within the meaning of the ADA and Rehabilitation Act.

101.    Plaintiff A.J. is a resident of Louisiana and recipient of Louisiana Medicaid.

102.    A.J. lives with his mother in Lacombe, Louisiana. His mother and father are separated. A.J.'s father is a truck driver and is out-of-town for long stretches but sees A.J. when he can. At present, A.J.'s mother is the only day-to-day, non-paid support in A.J.'s life.

103.     As set forth in the plan of care provided by his physician, A.J. has frequent, ongoing, and unpredictable skilled care needs that must be addressed by a licensed nurse.

104.     Defendants have approved A.J. for 84 hours per week of extended home health services through Medicaid EPSDT on the basis of medical necessity.

105.     There are qualified in-home shift nursing care providers in A.J.'s geographic area.

106.     Currently, A.J. is only being provided with approximately 32 hours per week of nursing services. A.J. generally relies on one regular nurse to provide those hours. That nurse may miss shifts, for example due to illness or vacation. As a result, the amount of nursing A.J. receives is unpredictable and can be less than 32 hours per week.

107.     A.J. is a recipient of the Medicaid Children's Choice Waiver. By definition, he is at serious risk of institutionalization if he does not receive the Medicaid services that he needs.

108.     A.J.'s mother has spoken with A.J.'s support coordinator about the lack of hours that he receives. A.J.'s support coordinator told her that she received the same complaints for clients across Louisiana and there was little that could be done about it.

109.     A.J.'s mother has switched home health agencies three times due to staffing issues. She has also switched support coordinators and has reached out to the Children's Hospital for guidance. None of these efforts resolved her inability to find nursing hours for her son.

110.     A.J.'s mother has not been given information on how to contact the Defendants or any other organization who could help her get the necessary number of

nursing hours for A.J. filled.

111.    A.J.'s mother assumes nursing tasks at all times that his nurses are not available to him. This means that, for all but up to 32 hours a week, A.J.'s mother is assuming the duties of providing his nursing care.

112.    In November 2018, A.J. had to have emergency surgery to remove part of his colon. He received an ileostomy at that time. After the surgery, the care needed for A.J. has increased, putting more pressure on his mother to provide care and creating a more urgent need that his nursing hours be filled.

113.    A.J.'s care needs prompted his mother to leave her job as a 911 operator. Leaving her job has made it very difficult to make ends meet for her family and made life extremely stressful. She has tried to work, but the lack of nursing hours caused her to leave the catering work she was doing.  If A.J. received his authorized nursing hours, his mom could go back to work so she could better support her family.

114.    A.J.'s current nursing hours are only during the day, meaning that his mom is responsible for care during the night. A.J. sometimes pulls his ventilator out at night, which means he cannot breathe. His mother rarely gets any sleep at night and has used the nursing hours during the day to nap. With the lack of nursing hours, unexpected nursing absences, and A.J.'s increased needs, she is not able to rest much during the day.

115.    A.J.'s mother has been diagnosed with severe exhaustion and depression. She has been ordered by her doctor to get more rest but it has not been possible due to the nursing care she provides for her son. A.J.'s mother has also been diagnosed with fibromyalgia and osteoarthritis. These conditions are aggravated when she has to care for and move A.J. without the assistance of a nurse

116.     The shortfall in hours puts A.J. and his mother's health and safety at risk and creates a great deal of stress on A.J. and his mother's lives. The shortage in nursing hours has impeded A.J.'s mother from working. A.J.'s mother is running out of money and is having difficulty paying her bills.

117.     Defendants have failed to provide meaningful access to services, oversee the implementation of services, or assist with locating, coordinating, and monitoring services for A.J.

118.     A.J.'s mother strongly desires that he continue to live at home with appropriate nursing services.

119.     If Defendants fail to arrange for the in-home shift nursing services at the level they approved, then A.J. may be forced to go into an institution, or, if he remains at home and receives in-home shift nursing at a level which is less than what is medically necessary, he is at serious risk of hospitalization or a life-threatening episode.

120.     Defendants' failure to arrange for medically necessary nursing services puts A.J. at serious risk of institutionalization.

**D.     Plaintiff G.M.**

121.     Plaintiff G.M. is a seven-year-old boy diagnosed with bronchopulmonary dysplasia, a seizure disorder, and autism.  G.M. was hospitalized for about a year after his birth. G.M. uses a ventilator and oxygen when he is sleeping and when he is sick. He also has a tracheostomy and a feeding tube. He requires skilled care 24 hours a day, seven days a week.

122.     Plaintiff G.M. is a qualified individual with a disability under the ADA and Rehabilitation Act. The Defendants have regarded G.M. as having a disability within

the meaning of the ADA and Rehabilitation Act.

123. Plaintiff G.M. is a resident of Louisiana and recipient of Louisiana Medicaid.

124. G.M. lives with his mother, father, and twelve-year-old sister in Denham Springs, Louisiana. G.M.'s mother is his primary caretaker. G.M.'s father works as a tugboat pilot, which means he works 12-hour shifts and an intermittent schedule.

125. G.M. has frequent, ongoing, and unpredictable skilled care needs that must be addressed by a licensed nurse. For example, G.M. will pull out his tracheostomy tube approximately five to ten times each day. Such behaviors must be remedied within two minutes or else the consequences could be fatal.

126. Defendants have approved G.M. for 84 hours per week of extended home health services through Medicaid on the basis of medical necessity.

127. Currently, G.M. is being provided with only 48 and 60 hours per week of nursing services. If G.M.'s nurse misses a shift, there is rarely anyone to fill in for the missing hours.

128. There are qualified in-home shift nursing care providers in G.M.'s geographic area.

129. G.M. is a recipient of the Residential Options Waiver (ROW). By definition, he is at serious risk of institutionalization if he does not receive the Medicaid services that he needs.

130. G.M. receives some Medicaid personal care assistance, but these workers do not provide nursing services such as replacing G.M.'s g-tube. The personal care assistance allows G.M.'s mom to do things around the house or help her daughter, but she

needs to be awake and readily available should a nursing need arise. On one occasion, due to the lack of an available nurse, G.M. pulled his trach out while G.M.'s mom was in the restroom. When she came out of the restroom, she discovered that G.M. was turning blue.

131.     G.M.'s current schedule of nursing, which is regularly Tuesday-Friday for 12 hours per day with every other Monday covered, means that G.M.'s mom may go three days without any nursing for G.M. For those three days she has little to no sleep, has very little time to attend to her daughter or any other family member, and is unable to work on or complete necessary household tasks.

132.     G.M.'s nursing schedule largely depends on one nurse. There have been a few short-term or fill in nurses, but often these nurses were not fully able to meet G.M.'s needs because of training or other issues.

133.     G.M.'s mother has complained to his support coordinator and his home health agency's case manager about the lack of nursing to fill G.M.'s approved nursing hours. She has been told that there is nothing that anyone can do because there are no nurses available to cover the missing shifts.

134.     G.M.'s mother has also mentioned the shortage of nursing hours directly to Defendant Gee and with LDH's Medicaid Director during in-person meetings.  In response she was told that there is a nursing shortage. She was never given any indication that anyone is working on resolving this problem or that Defendants would be able to do anything to assist her and G.M. with the ongoing issue.

135.     G.M.'s mother assumes nursing services at all times that his nurses are not available to him.

136.     As a result of the demanding requirements of caring for G.M., G.M.'s mother has been diagnosed with anxiety, migraines, exhaustion, and post-traumatic stress disorder. G.M.'s mother is also frequently unable to use the bathroom since she is unable to leave G.M. alone for any extended period of time. This has resulted in additional gastrointestinal issues.

137.     G.M.'s mother is fearful that her exhaustion will cause her to make mistakes that could adversely impact G.M.'s health.

138.     G.M.'s father was recently put on anxiety and depression medications due to the stressors caused by G.M.'s health and the lack of nursing care.

139.     Defendants has failed to provide meaningful access to services, oversee the implementation of services, or assist with locating, coordinating, and monitoring services for G.M.

140.     G.M.'s family has oriented their lives around G.M.'s care and they strongly desire that he continue to live at home with appropriate nursing services. G.M. is a joy for his family to be around and always makes them laugh. Living with his family allows G.M. to enjoy the same things that other children his age enjoy.

141.     Due to Defendants failure to arrange for the in-home shift nursing services at the level deemed medically necessary and approved for payment, G.M faces a strong risk of a life-threatening episode and hospitalization.

142.     Defendants' failure to arrange for medically necessary nursing services also puts G.M. at serious risk of institutionalization.

**E.     Plaintiff B.W.**

143.     Plaintiff B.W. is a thirteen-year-old boy diagnosed with Leigh's Disease.

Leigh's Disease is a rare progressive neurodegenerative disorder. Leigh's disease is a rare and severely progressive degenerative neurological disease. This inherited neurometabolic disorder affects the central nervous system. Symptoms of Leigh's disease usually progress rapidly. Symptoms include the inability to swallow, loss of head control and motor skills, extremely low muscle tone and inability to clear secretions, daily seizures, impairment of the respiratory system and kidney function. B.W. was not expected to live past the age of two by his doctors. B.W. has a tracheostomy, a ventilator and a feeding tube. He requires skilled care 24 hours a day, seven days a week.

144.     Plaintiff B.W. is a qualified individual with a disability under the ADA and Rehabilitation Act. The Defendants has regarded B.W. as having a disability within the meaning of the ADA and Rehabilitation Act.

145.     Plaintiff B.W. is a resident of Louisiana and recipient of Louisiana Medicaid.

146.     B.W. lives with his mother, father, and three-year-old sister in Baton Rouge, Louisiana. B.W.'s mother and father both work full-time jobs in addition to the care they prove for B.W.

147.     B.W. has frequent, ongoing, and unpredictable skilled care needs that must be addressed by a licensed nurse.  B.W.'s body produces a large amount of secretions that can trigger a dangerous drop in his oxygen levels. Ventilator alarms sound frequently. A nurse is needed for constant suctioning to keep his airway clear so that he can breathe. If administered incorrectly or delayed, he could die. B.W. depends on a gastronomy tube to take his meals and medication. He needs cough assist therapy, supplemental oxygen, careful repositioning, and constant monitoring to provide immediate medical care in

emergency situations.

148.     Defendants have approved B.W for 118 hours per week of extended home health services through Medicaid on the basis of medical necessity.

149.     B.W.'s schedule is inconsistent. On rare occasions, he receives all 118 hours of medically necessary skilled nursing, but most weeks there are significant gaps in coverage. For example, in the week of April 14-20, 2019, B.W. was only able to receive 84 hours of skilled nursing.

150.     On nights where no overnight nurse is available, B.W.'s mother gets almost no sleep. An alarm goes off six to twenty times each night alerting her that B.W.'s needs her urgent attention. The alarm wakes her up and she goes to care for her son.

151.      When one of B.W.'s nurses misses a shift, there is rarely anyone other than his family to fill in for the missing hours.

152.     There are qualified in-home shift nursing care providers in B.W.'s geographic area.

153.     B.W. is a recipient of the New Opportunities Waiver. By definition, he is at serious risk of institutionalization if he does not receive the Medicaid services that he needs.

154.     B.W.'s mother has complained to his support coordinator and to numerous individuals at his home health agency about the lack of nursing to fill B.W.'s approved nursing hours. She has been told that there is nothing that anyone can do because no nurses are available to provide the Medicaid-funded services. It has been recommended to her that she recruit nurses herself by passing out flyers outside of medical facilities. B.W.'s mother does not have the time to do this.

155.     B.W.'s mother or father must provide nursing care to him at all times that nurses are not available to him.

156.     As a result of the demanding requirements of caring for B.W., B.W.'s mother has almost died. One night she had to rush to the hospital Emergency Room, where she was treated and released with the same symptoms and severe pains she arrived with. Later that day, upon examination by her clinical physicians, she was admitted into another hospital, where she was diagnosed as being on the verge of septic shock. After several additional days of extensive and thorough testing, B.W.'s mother was scheduled for urgent surgery after discovery of symptomatic hernia, diverticulitis, multiple organ adhesions, pockets of mystery fluid and an appendix on the verge of bursting. During this hospital stay, three surgeons performed eight procedures to address her medical needs caused by exhaustion and years of anxiety and stress in attending to B.W.'s medical needs and the lack of assistance.

157.     Defendants have failed to provide meaningful access to services, oversee the implementation of services, or assist with locating, coordinating, and monitoring services for B.W.

158.     B.W.'s family has oriented their lives around B.W.'s care and they strongly desire that he continue to live at home with appropriate nursing services.

159.     Due to Defendants failure to arrange for the in-home shift nursing services at the level deemed medically necessary and approved for payment, B.W faces a strong risk of a life-threatening episode and hospitalization.

160.     Defendants' failure to arrange for medically necessary nursing services puts B.W. at serious risk of institutionalization.

**E.    Plaintiff B.C.**

161.    Plaintiff B.C. is a fifteen-year-old boy diagnosed with Cri Du Chat syndrome and a significant intellectual disability. Cri Du Chat Syndrome, which is also known by the name of Chromosome 5p Deletion Syndrome, is a rare inherited disorder, which is caused due to missing chromosome 5 from the body. The disorder causes various complications and symptoms, including delayed growth, intellectual and motor disabilities, and microcephaly.

162.    B.C. has extreme difficulty breathing and relies on a tracheostomy tube at all times. He also requires regular suctioning to clear his airways. If he does not receive this suctioning on time he will be unable to breathe and could die. In addition to the tracheostomy, B.C. uses a G-tube for feeding and for medication. B.C. expresses himself through self-harm. When he is unhappy or he needs something, he hits himself violently and continuously until the issue is fixed. This self-harm behavior causes B.C. to regularly dislodge his tracheostomy tube.

163.    Plaintiff B.C. is a qualified individual with a disability under the ADA and Rehabilitation Act. The Defendants has regarded B.C. as having a disability within the meaning of the ADA and Rehabilitation Act.

164.    Plaintiff B.C. is a resident of Louisiana and recipient of Louisiana Medicaid.

165.    B.C. lives with his mother and siblings in Amite City, Louisiana. B.C.'s mother cannot work because she must be present to care for his needs at all times.

166.    Between the ages of three and ten, B.C. lived in an intermediate care facility, which is an institutional placement for people with intellectual and/or

developmental disabilities. B.C.'s mother tried everything she could think of to get him out of the facility but there were not enough services available to keep him safe and healthy in his mother's home.

167.    B.C. was finally able to return to his family home in May of 2014. Upon discharge he received approximately 70 hours of extended home health services from an in-home nurse. He also received 98 hours of services from a personal care attendant. B.C. was thriving during this period. He did not need to go to the hospital once. When changes were needed, such as medication or durable medical equipment, B.C.'s nurses could catch it early. These nurses were able to quickly get approval from B.C.'s doctors to make the necessary changes to his medications as well.

168.    In early 2017, Defendants terminated all 70 hours of B.C.'s extended home health nursing services. B.C.'s mother was informed that the nursing tasks that B.C. needed could be met by a daily visit from the nurse. This information was relayed to B.C.'s mother through both his home health provider and his doctor. She was told that nursing visits of three hours per day or less did not require prior authorization.

169.    Upon receiving this denial, B.C.'s mother was unable to find a home health provider agency willing to provide nursing services for so few hours. She called home health provider agencies directly. She also sought assistance from her support coordinator. All efforts to obtain nursing services for these hours were unsuccessful.

170.    B.C.'s mother attempted to obtain extended home health hours three times after his initial termination. B.C. was denied each time. In each notice of denial, B.C. was informed that he could obtain a daily nursing visit without going through the prior authorization process. These notices explained what tasks B.C. needed from a nurse but

34

did not explain what B.C. should do if there were no provider agencies available to actually provide the service.

171.     B.C.'s health has significantly worsened since his nurses stopped coming. He has been hospitalized over 10 times, often for conditions that could have been identified and remedied by an in-home nurse. B.C. did not go to hospital once during the period where he had in-home nursing.

172.     B.C. currently has personal care attendants for 18 hours a day. While they are helpful and have learned some nursing tasks, there are a number of tasks they are unqualified or unpermitted to undertake. For example, they cannot check B.C.'s vital signs. Checking B.C.'s vital signs is extremely important because he is non-verbal and cannot express if something is wrong. The personal care attendants also cannot do any maintenance on his tracheostomy or reinsert his tracheostomy tube if B.C. hits it out of place. On average, B.C. knocks his tracheostomy tube out of place about every three days due to self-harm. The personal care attendants cannot suction B.C. if his airways become obstructed. Suctioning does not occur on a schedule, but is an as-needed task. B.C.'s mother is the only person available who can address matters outside the scope of the personal care attendants' competencies.

173.     B.C.'s mother, who is not a nurse, is on call 24 hours a day, seven days a week. She has not received training on how to look for respiratory distress, to identify needed changes to his medications or to identify new or emerging medical issues. When something changes with B.C.'s often-volatile health, she does not have anyone to ask questions regarding B.C.'s needs. Because of this, she is constantly taking B.C. to the doctor or the hospital if there is any change in his condition.

174. There are qualified in-home shift nursing care providers in B.C.'s geographic area.

175. B.C. is a recipient of the New Opportunities Waiver. By definition, he is at serious risk of institutionalization if he does not receive the Medicaid services that he needs.

176. B.C.'s lack of nursing has had a devastating impact on his family. His mother has been diagnosed with Post-traumatic stress disorder as a result of B.C.'s needs. She is constantly exhausted because she is rarely able to sleep through the night without waking up to take care of B.C.

177. B.C.'s mother struggles to participate in the lives of her other children's activities because of B.C.'s needs. Despite her efforts, B.C.'s mother's relationship with her other children has suffered because she must spend all her time caring for B.C.

178. Defendants have failed to provide meaningful access to services, oversee the implementation of services, or assist with locating, coordinating, and monitoring services for B.C.

179. B.C. is much happier and healthier in home as opposed to an institution as long as the family has the necessary services. B.C. is charismatic and has a smile that brightens his family members' day. He gives his family hugs, scratches their heads, and loves them and receives love and attention from his family in return. His family does not want him to return to an institution and fears for his safety if he were to do so. If Defendants fail to arrange for the in-home shift nursing services at the level they approved, then B.c. may be forced back into the institutional setting his family fought so hard to get him out of; if he remains at home and receives in-home shift nursing at a level

which is less than what is medically necessary, he faces a strong possibility of hospitalization, or a life-threatening episode.

180.    Defendants' failure to arrange for medically necessary nursing services puts B.C. at serious risk of institutionalization.

**F.    Classwide Allegations**

181.    Defendants have failed to provide and arrange for the authorized Medicaid in-home nursing services for each of the named Plaintiffs and Class members in violation of the EPSDT and reasonable promptness provisions of the Medicaid Act as well as the non-discrimination requirements of the ADA and Section 504.

182.    Plaintiffs and Class members have medical needs that require in-home nursing, and the Defendants' policies, practices, and procedures fail to ensure they receive the nursing services for which they have been authorized. This failure on the part of Defendants puts the Plaintiffs and Class members at risk of hospitalization and institutionalization.

183.    Defendants' policies, practices, and procedures incentivize home health agencies to work with families and clinicians during the plan of care process to only request the nursing hours that they will provide. Plaintiffs and Class members have been advised by home health agencies that an approval of additional in-home nursing hours may cause the agency to discharge them because the agency will be unable to staff the approved hours. Class members placed in this quandary will often opt not to request additional hours for fear their home health provider will discharge them.

184.    Defendants have engaged in a policy and practice of failing to monitor support coordination agencies to ensure that the agencies are adequately providing the

necessary resources and supports to ensure that Plaintiffs and Class members receive the entirety of their medically necessary skilled nursing hours.

185. Defendants have engaged in a policy and practice of failing to train support coordinators to understand or advocate for the use of existing rate modifiers.

186. Defendants have engaged in a policy and practice of failing to monitor the MCO plans to ensure that care coordination is being conducted or that the care coordination is effective in assisting individuals in obtaining medically necessary services.

187. Defendants policies, practices, and procedures do not regularly monitor the quantity of how many authorized in-home nursing hours Class members have been able to actually attain.

188. Defendants have engaged in a policy and practice of failing to provide a mechanism by which Class members can directly access Defendants' assistance when their support coordinator or home health provider agency is unable to fill all of the hours deemed medically necessary.

189. Defendants fail at a systemic level to provide effective case management and otherwise arrange for medically necessary in-home nursing services, thereby placing the burden on families to provide medically necessary in-home nursing services for their medically complex children.

**FIRST CLAIM FOR RELIEF**
(Against Defendant Secretary Rebekah Gee)
**Violation of the Federal Medicaid EPSDT Mandate**

190. Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

191.   Defendant Gee, while acting under the color of law, has failed to provide Plaintiffs and Class members with in-home shift nursing services necessary to correct or ameliorate their conditions in violation of the EPSDT provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B), 1396d(r)(5), and 1396a(a)(43)(C).

192.   Defendant Gee, while acting under the color of law, has failed to "arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment [in-home shift nursing services]" to Plaintiffs and Class members in violation of the EPSDT provisions of the Medicaid Act, 42 U.S.C. § 1396a(a)(43)(C).

193.   Defendant Gee's violations have been repeated and knowing and are ongoing, and entitle Plaintiffs and Class members to relief under 42 U.S.C. § 1983.

### SECOND CLAIM FOR RELIEF
(Against Defendant Secretary Rebekah Gee)
**Violation of the Federal Medicaid Reasonable Promptness Requirement**

194.   Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

195.   Defendant Gee is engaged in the repeated, ongoing failure to arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment, despite Defendant's acknowledgment that in-home shift nursing services are medically necessary for all named Plaintiffs and Class members.

196.   Defendant Gee has acted under color of law in failing to provide in-home shift nursing services to Plaintiffs with "reasonable promptness," in violation of 42 U.S.C. § 1396a(a)(8).

197.   Defendant Gee's violations have been repeated and knowing, and entitle Plaintiffs to relief under 42 U.S.C. § 1983.

**THIRD CLAIM FOR RELIEF**
(Against Defendant Secretary Rebekah Gee)
**Violation of the Americans with Disabilities Act**

198.  Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

199.  Title II of the ADA provides that no qualified person with a disability shall be subjected to discrimination by a public entity.  42 U.S.C. §§ 12131-32.  It requires public entities to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d).

200.  Plaintiffs and Class members are "qualified individuals with a disability" within the meaning of the ADA in that they have physical and mental impairments that substantially limit one or more major life activities, including their ability to live independently without support.

201.  Plaintiffs and Class members meet the essential eligibility requirements for Louisiana Medicaid, including by requiring services necessary to maintain them in their homes in the community.

202.  Defendant Gee is the Secretary of Defendant LDH, which is responsible for administering Louisiana's Medicaid program in accordance with state and federal law, and is therefore a government entity subject to Title II of the ADA.  42 U.S.C. §§ 12131(1)(A)-(B).

203.  Defendant Gee is obligated under the ADA to administer LDH's programs in a manner that enables qualified individuals with disabilities to live in the most integrated setting appropriate to their needs.  Defendant's failure to arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment (in-

home shift nursing services) for qualified individuals with disabilities such as Plaintiffs and Class members has placed them at risk of institutionalization in violation of the ADA's integration mandate.

204.   Defendant Gee has discriminated against qualified individuals with disabilities such as Plaintiffs and Class members by failing to provide reasonable modifications to programs and services in order to arrange for medically necessary in-home shift nursing.

205.   Defendant Gee has utilized criteria and methods of administration that subject Plaintiffs, Class members, and other qualified individuals with disabilities to discrimination on the basis of disability, including risk of unnecessary institutionalization, in ways that include failing to take the necessary steps to arrange for medically necessary in-home shift nursing.

206.   Defendant Gee's actions are in violation of Title II of the ADA.

207.   Plaintiffs and Class members are entitled to declaratory and injunctive relief to remedy Defendant's violations of the ADA.

### FOURTH CLAIM FOR RELIEF
(Against Defendants LDH and Secretary Rebekah Gee)
**Violation of Section 504 of the Rehabilitation Act**

208.   Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

209.   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits public entities and recipients of federal funds from discriminating against any individual by reason of disability. Public and federally-funded entities must provide programs and activities "in the most integrated setting appropriate to the needs of the qualified

individual with a disability." *See* 28 C.F.R. § 41.51(d). Policies, practices, and procedures that have the effects of unjustifiably segregating persons with disabilities in institutions constitute prohibited discrimination under Section 504.

210.   Plaintiffs and Class members are "qualified individuals with a disability" under Section 504 of the Rehabilitation Act of 1973 in that they have physical and/or mental impairments that substantially limit one or more major life activities, including their ability to live independently without support.

211.   Plaintiffs and Class members meet the essential eligibility requirements for Medicaid services, including services necessary to maintain them in their homes in the community.

212.   LDH is a recipient of federal funds under the Rehabilitation Act and is therefore a government entity subject to Section 504.  29 U.S.C. § 794(b).

213.   Defendants' failure to arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment (in-home shift nursing services) to Plaintiffs and Class members places them at risk of institutionalization in violation of Section 504's integration mandate.

214.   Defendants have utilized criteria and methods of administration that subject qualified individuals with disabilities, such as Plaintiffs and Class members, to discrimination on the basis of disability, including risk of unnecessary institutionalization, by Defendants' failure to arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment (in-home shift nursing services) to Plaintiffs and Class members.

215.   Plaintiffs and Class members are entitled to declaratory and injunctive relief

to remedy Defendants' violations of Section 504.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court order the following relief and remedies on behalf of themselves and all others similarly situated:

a. Certify the proposed Class;

b. Issue a declaratory judgment in favor of the Plaintiffs and the Class that Defendants have been failing to comply with the requirements of the Medicaid Act, the Americans with Disabilities Act, and the Rehabilitation Act;

c. Declare that Defendants' failure to arrange directly or through referral to appropriate agencies, organizations, or individuals, corrective treatment (in-home shift nursing services) to Plaintiffs and Class members is unlawful;

d. Issue preliminary and permanent injunctive relief enjoining Defendants from subjecting Plaintiffs and Class members to practices that violate their rights under the Medicaid Act, ADA, and Section 504;

e. Issue preliminary and permanent injunctive relief requiring Defendants to arrange directly or through referral to appropriate agencies, organizations, or individuals, corrective treatment (in-home shift nursing services) to Plaintiffs and Class members;

f. Retain jurisdiction over the Defendants until such time as the Court is satisfied that Defendants' unlawful policies, practices, and acts complained of herein cannot recur;

g.  Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C. §§ 1988, 12133, and 12205 and any other applicable law or regulation; and

h.  Grant such other and further relief as the Court deems to be just and equitable.

Respectfully submitted this 22nd day of May, 2019,

A.J., G.M., B.W. and B.C.,
By and through their parents

/s/Amitai Heller
Amitai Heller, La. Bar No. 36495, T.A.
Ronald Lospennato, La. Bar No. 32191
Advocacy Center
8325 Oak Street
New Orleans, Louisiana 70118
Phone: (504) 522-2337, ext. 116
Facsimile: (504) 522-5507
aheller@advocacyla.org
rlospennato@advocacyla.org

/s/ Jane Perkins
Jane Perkins
Elizabeth Edwards
National Health Law Program
200 N. Greensboro St., Ste. D-13
Carrboro, NC 27510
(919) 968-6308
perkins@healthlaw.org
edwards@healthlaw.org
*Pro hac vice to be submitted*

**Counsel for the Plaintiffs**